ORDERED.

Dated: July 10, 2015

K. Rodney May
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re                                                    Case No. 8:13-bk-13355-KRM
                                                         Chapter 11
Rover Technologies, LLC,

    Debtor.
_____/

**MEMORANDUM OPINION AND ORDER SUSTAINING,
IN PART, OBJECTION TO DEBTOR'S MOTION FOR FINAL DECREE**

Within four months after achieving confirmation of its Chapter 11 plan, the Debtor filed what appeared to be a routine motion for entry of a final decree, based on the allegation that the plan had been substantially consummated.[1] The motion also represented that the plan payments had been "completely funded by one of the holders of an equity interest in the Debtor, Gregory Matton . . . [who] now holds 100% of the equity . . . ."[2] Another member (and co-founder) of the Debtor, Bryan Kearney ("Kearney"), filed an objection to the motion, arguing that Matton

---

[1] Doc. No. 64.
[2] *Id* at p. 2.

had paid creditors and extinguished the interests of the other seven equity holders without proper notice.[3]  The motive behind such action, Kearney alleges, is to insulate another company owned solely by Matton, Apex Data Solutions, LLC ("Apex"), from liability for taking the Debtor's technology and business.[4]

The only issue before the Court, however, is whether the plan was implemented unfairly to squeeze out the other equity holders.[5]  For the reasons stated below, the Court concludes that the equity holders, including Kearney, did not receive sufficient notice of the amount, timing and procedure for making the capital contributions required to retain their interests.  Accordingly, there has been no forfeiture.  The Court will direct the Debtor to engage disinterested special counsel to devise and implement a solicitation of capital contributions from all of the equity holders, pro rata, in the percentages stated in the court-approved disclosure statement.[6]

## FACTUAL BACKGROUND

The Debtor

The Debtor is a software development company, co-founded in 2006 by Bryan Kearney and former member Robert Letseizen.  The Debtor's business was creating software for medical data workflow using digital pen technology.  The Debtor had contracted with another company, NextSphere Technologies, Inc., to enhance the software and codes; but, the parties ended up in an expensive lawsuit over a contract dispute.  The Debtor filed for relief under Chapter 11 on October 7, 2013, to stop that lawsuit.

---

[3] Doc. No. 68.
[4] In February of 2013, Mr. Matton formed Rover Labs, LLC, later renamed Apex Data Solutions, LLC.  Kearney and Matton have ongoing disputes regarding dividends due from another venture, Global Servicing Solutions, LLC ("GSS"), which they formed in 2012.  Matton describes GSS as a consulting firm supporting a software platform outside the scope of the Debtor's business.  Kearney disputes that, claiming that GSS serves the Debtor's clients.  Matton and Kearney have equal interests in GSS, which provides cash to the Debtor, Matton and Kearney from time to time.  Second Trial Tr. 10:19-21; 16:10-16; 108:3-109:23; 141:10-142:7.
[5] Doc. Nos. 68, 110, 112, 113, 173, 176.
[6] Doc. No. 39.

The disputing parties met in 2007 while Matton, an experienced corporate lawyer, was at Broad & Cassel doing legal work for the Debtor.[7] In October 2010, Matton joined the Debtor's management team. Shortly thereafter, he became the CEO, at a salary of $120,000 per year. Matton never got paid, but exercised a privilege to convert unpaid salary into an increasing percentage of equity. Kearney was the Managing Partner and Chairman; Alan Satterwhite was the CFO; Dr. Greg Shorr, the Chief Medical Information Officer; and Robert Calco ("Calco"), the Chief Architect and Lead Developer.[8] Matton and Kearney remained managers of the Debtor post-petition.

According to the disclosure statement, bearing Kearney's electronic signature, the members of the Debtor on the petition date were as follows:[9]

| | |
|---|---|
| Bryan Kearney | 42% |
| Gregory Matton | 42% |
| Dr. Greg Shorr | 8% |
| Alan Satterwhite | 2% |
| Magan Bakarania | 1% |
| Seymour and Kathleen Eldridge | 1% |
| Talario Data, LLC | 4% |

The exact ownership interests of members, particularly those of Matton and Kearney, are now in dispute. The following table prepared by Matton (post-trial brief, Doc. No. 176, at 24) illustrates the alleged changes in ownership of the three largest equity holders:[10]

---

[7] Second Trial Tr. 23:11-25:7.
[8] Doc. No. 39 and First Trial Tr. 144:20–22.
[9] Doc. No. 39. Likewise, Item 21 of the Statement of Financial Affairs, Doc. No. 25-6, reflects the interests of Kearney and Matton at 42.7% each. Kearney disputes that he signed, or authorized the use of his signature on, the disclosure statement or the Chapter 11 petition.
[10] See Kearney Exhibits 55-58; Doc. No. 144, Exhibit D, and Exhibit E.

|  | 2010 K-1s | | 2011 K-1s | | 2012 K-1s | | 2013 K-1s (Original) | | Disclosure Statement |
|---|---|---|---|---|---|---|---|---|---|
|  | Start | End | Start | End | Start | End | Start | End | Dec. 11, 2013 |
| **B. Kearney** | 71.2% | 71.2% | 41.8% | 41.8% | 34.0% | 34.0% | Not produced | Not produced | 42.0% |
| **G. Matton** | - | - | 7.9% | 7.9% | 24.5% | 24.5% | 24.84% | 42.71% | 42.0% |
| **Dr. Shorr** | - | - | - | - | - | - | 8.02% | 7.35% | 8.0% |

At trial, Kearney introduced a revised 2013 Schedule K-1, which purported to show that he now owns as much as 73.60% of the Debtors' equity.[11] But, he gave no testimony to explain how, during the course of 2013, his equity position grew to 73.6 – a greater percentage than he owned in 2010 – or how Matton's equity position was reduced.

Confirmation of the Chapter 11 Plan

The Debtor's plan and disclosure statement were filed promptly, on December 11, 2013. Section 4 of the plan provided for the payment of claims:

> Class 2 – $26,923 owed to the Hillsborough County tax collector – to be paid at a rate of $650 per month for 60 months.[12]
>
> Classes 3 and 4 - no payment to be made on claims of GSS and "the Unsecured Claims held by any Holder of an Equity Interest …with the sole exception of Unsecured Claims held by Seymour and Kathleen Eldridge, which shall be treated within Class 5."[13]
>
> Class 5 - the General Unsecured Claims will receive approximately $36,000, or 5% of the allowed amount of their claims in 12 monthly installments.[14]

Section 4 of the plan also required holders of equity interests to make capital contributions to fund the creditor payments:

---

[11] Kearney Exhibit 58. Matton challenges the validity of that K-1.
[12] Doc. No. 61.
[13] Doc. No. 38.
[14] *Id.*

4

> "Holders of Equity Interests in the Debtor shall be able to retain their interests in the Debtor provided that each shall make a financial contribution to the Debtor in an amount equal to such holder's percentage interest in the Debtor multiplied by $65,000, payable in 12 consecutive monthly payments beginning on the Effective Date. *To the extent that any Holder of an Equity Interest does not comply with this provision for any payment hereunder, the relevant equity interest, or appropriate portion thereof, shall be cancelled.*"[15]

The Court conducted a hearing on January 30, 2014, on both the adequacy of the disclosure statement and confirmation of the Chapter 11 plan. No party objected to the disclosure statement. The only objection to the plan, filed by the Hillsborough County Tax Collector, was overruled.[16] Kearney voted to accept the plan in his status as a creditor.

The Order Confirming Plan was entered on February 28, 2014.[17] The "Effective Date" of the plan was to be "the first (1st) Business Day that is thirty (30) days following the entry of the Confirmation Order," which would have been March 31, 2014.[18] That became the deadline for equity holders to make their initial capital contributions to retain their interests.

Consummation of the Plan

The March 31st effective date came and went. None of the members, including Kearney and Matton, made any capital contributions by that date.

Leading up to that date, counsel for the debtor-in-possession, Mr. Brundage ("Attorney Brundage" or "Debtor's counsel"), sent an email on March 26, 2014, only to Matton, informing him of the amounts that would have to be paid to each creditor, if they were to get the promised 5% distribution in a lump sum. He also suggested to Matton that Hillsborough County might accept less than its $26,923 claim if it were paid in full.[19]

---

[15] Doc. No. 38 at p. 6. (emphasis added).
[16] Doc. No. 46.
[17] Doc. No. 61.
[18] Doc. No. 38 p. 4.
[19] Kearney Exhibit 13.

5

In this email, Attorney Brundage informed Matton of what it would take to pay off all creditors:

> "Total funding is $33,371 + 2,420.22 = $35,791.22 plus whatever we can work out with Hillsborough County."
>
> \* \* \*
>
> "My advice is that we pay 5% to the creditors as this was what I promised the Judge and is the most accurate reading of the plan that we filed. I looked back at the NextSphere deal and it clearly spells out that NextSphere will be entitled receive payment on its Class 5 unsecured claim. So, I had to include them in the mix."
>
> \* \* \*
>
> "Will let you know when I hear back from Hillsborough. Thanks. Mike."

Even though this was five days before the capital contribution deadline, no other member was advised by counsel that the amount to be paid might be different than the $65,000 set forth in the plan, or that the Debtor might be making all payments in full, instead of over 12 months, or 60 months to the County.[20] The parties now dispute whether these details were verbally communicated to any other members.[21]

About an hour after receiving the March 26th email, Matton emailed Kearney to request that he provide sixteen signed blank checks from the debtor-in-possession bank account.[22] Matton told Kearney that these checks would be used to begin making payments under the plan and that he (Matton) would make a deposit and provide copies of the checks to Kearney.

---

[20] Second Trial Tr. 15:2-13; 36:15-39:7; 50:25-51:15.

[21] Attorney Brundage indicates he took no action beyond his communications with Matton. Matton testified that he separately spoke to Dr. Shorr and Kearney regarding the capital contributions and that Kearney agreed to talk with all of the other members. Second Trial Tr. 37:10-39:7. Kearney disputes any such discussion or agreement with Matton. Second Trial Tr. 15:2-13; 181:12-17. Matton maintains that Dr. Shorr confirmed he was not interested in contributing. Except for Dr. Shorr and the disputed discussion with Kearney, there is no indication that Matton communicated with any of the other members regarding the proposed alteration of funding requirements. Second Trial Tr. 38:3-40:11.

[22] Kearney Exhibit 14.

Kearney delivered the blank checks to Matton, as requested. He also requested that Matton provide a list of the creditors and the claims to be paid with the checks to "keep the books."[23] The list of creditors and claim amounts were never provided to Kearney.[24]

Meanwhile, Attorney William Collins, on behalf of Kearney, wrote Matton on April 23, 2014, requesting information about Apex and GSS.[25] Neither Mr. Collins, nor Kearney received a response.[26]

On April 24, 2014, Kearney's brother, Bing, sent an email to Matton seeking to "accelerate a resolution to the current affairs and actions by you."[27] A few hours later, Brundage re-sent his March 26th email to Matton.[28]

Also on April 24, 2014, Matton met with Dr. Shorr, without notice to the other members. The two of them signed a "Consent to Action in Lieu of Special Meeting," purporting to be a majority of the Debtor's members. The action they took, by consent, was to remove Kearney from his position as Managing Partner and Chairman of the Debtor.[29]

The next day, on April 25, 2014, Attorney Brundage advised Matton that the funds to pay creditors' claims did not have to be deposited into the debtor-in-possession bank account.[30] In an email, he advised Matton that he could deposit money into a segregated bank account, or

---

[23] Kearney Exhibit 14.
[24] First Trial Tr. 66:17-20.
[25] Kearney Exhibit 15.
[26] First Trial Tr. 74:7-18.
[27] Kearney Exhibit 16.
[28] Kearney Exhibit 20.
[29] Kearney Exhibit 18. The Chapter 11 Plan provided that after confirmation Kearney and Matton were to continue to manage the Debtor. Doc. No. 38 p. 8. Matton alleges that Satterwhite was terminated as CFO, for cause, on March 10, 2014. However, Kearney and Satterwhite contend that he is still employed as a consultant doing tasks as assigned by Kearney. By March 2014, Dr. Shorr was working for a different entity, Apex Data Solutions, LLC ("Apex"), formed by Matton in 2013. Robert Calco also moved from the Debtor to Apex a bit later. Apex performs work that is arguably similar to that of the Debtor. Kearney contends that Dr. Shorr and Mr. Calco are working for Apex in substantially the same capacities as they did for the Debtor. Second Trial Tr. 66:14-16; Kearney Exhibit 43 First Trial Tr. 144:2—145:3. The bigger grievance alleged by Kearney is that Matton, through Apex, has usurped the Debtor's assets and business. Doc. No. 68.
[30] Email sent on April 25, 2014. Kearney Exhibit 19.

purchase cashier's checks to pay the creditors.[31]

That same day, Matton paid all of the Debtor's creditors in full, some $56,250, using money he had borrowed from two friends, including a $9,000 discount agreed to by the County. The payments were made by cashier's checks, rather than the debtor-in-possession checks previously signed and provided by Kearney.[32]

On May 13, 2014, Mr. Satterwhite, sent an email to Attorney Brundage requesting "an immediate accounting and details" of the Chapter 11 plan. Attorney Brundage forwarded Satterwhite's email to Matton, who instructed Attorney Brundage not to respond to it.[33]

Matton did not inform Kearney that he had been removed as Managing Member until May 19, 2014.[34] Matton advised Attorney Brundage, via email on or about May 19, that he had removed Kearney. He also instructed Attorney Brundage to "not provide Company-related information to [Kearney] going forward."[35]

Matton alleges that Kearney was "broke" and uninterested in the Debtor's affairs. He also asserts that Kearney never told him that any of the other members would contribute. Dr. Shorr had already informed Matton that he did not want to retain his equity interest in the Debtor. Matton also contends that he was concerned, based upon his prior discussions with Kearney, that no payments would be made by any member by the March 31 effective date – with the result that the Debtor's case would be dismissed and that continued litigation with NextSphere would destroy the company.[36]

---

[31] Kearney Exhibit 19.
[32] Kearney Exhibit 20; Second Trial Tr. 122:1-23.
[33] Kearney Exhibit 23.
[34] Kearney Exhibit 25.
[35] Kearney Exhibit 24.
[36] Second Trial Tr.119:18 – 120:16.

On June 5, 2014, Brundage prepared and filed a Certificate of Substantial Consummation of Chapter 11 Plan and a motion seeking entry of a final decree.[37] Notice of these filings was only provided to the U.S. Trustee's Office; they were not served on Kearney or any other members.[38]

The Motion for Final Decree included the following language (emphasis added):

> On or about April 25, 2014, the claims in Class 2 were paid in full and the holders of Class 5 general unsecured claim received full payment of their pro rata share of the Plan Fund. Therefore, the Plan has been substantially consummated. *The Plan Fund was completely funded by one of the holders of an equity interest in the Debtor, Gregory Matton. Therefore, pursuant to Section 4.1 of the confirmed Plan, Mr. Matton now holds 100% of the equity interests in the Debtor.*

The initial draft of the motion did not include the italicized language. After reviewing the initial draft prepared by Attorney Brundage, Matton suggested that the italicized language be added.[39] In his email, Matton asked Brundage if this proposed change "would pass muster with Judge May?"[40] Attorney Brundage responded that "it's worth a try."[41]

In late April and early June, Kearney asked Matton and Brundage, respectively, for access to the Debtor's books and records and for details of the bankruptcy case.[42] Matton ignored the correspondence and advised others not to communicate with anyone other than himself about the Debtor. On June 24, 2014, Kearney filed his objection to the motion for final decree.[43]

---

[37] Doc. Nos. 63 and 64.
[38] Kearney Exhibits 28, 63; Second Trial Tr. 53:8-16.
[39] Kearney Exhibit 26.
[40] *Id.*
[41] *Id.*
[42] See Kearney Exhibits 15, 16, 23 & 27.
[43] Doc. No. 69. In August 2014, Kearney initiated an adversary proceeding against the Debtor seeking revocation of the Confirmation Order due to alleged fraud by Matton in procuring confirmation. Kearney later voluntarily dismissed that proceeding (Doc. No. 16), choosing instead to seek remedies through this contested matter.

## ANALYSIS

Kearney asks the Court to exercise the reservation of jurisdiction in the confirmation order to deny the motion for final decree.[44] He asks that the members' capital contributions be reopened with the following conditions: (1) the Debtor must file a list of the names and addresses of members as of the petition date; (2) a deadline be established for members to file proofs of membership interest; (3) notice of the deadline for filing a proofs of membership interests must be served on all equity holders as of the petition date; (4) any equity holder who desires to retain an equity position in the reorganized Debtor must submit with their proof of membership interest evidence that they are ready, willing, and able to make a financial contribution representing their percentage interest in the Debtor multiplied by $65,000 (consistent with the Class 6 treatment); and (5) a deadline be established for any member to object to any filed proof of membership interest."[45] Once armed with this information, Kearney asks that the Court adjudicate any ownership disputes, determine who owes what under the plan, and oversee the contributions of capital.

Matton and the Debtor renew their request for entry of the final decree closing the case. They maintain that the previous equity holders have forfeited their interests in the Debtor by their default under Section 4 of the plan. Matton contends that the evidence establishes that Kearney knew of the capital contribution requirement and the deadline established by the order confirming the plan. Alternatively, Matton argues that if capital contributions are to be reopened, participation be limited to Kearney; or that the Court should apply the equity interests as stated in the court-approved disclosure statement.

---

[44] In Paragraph 15 of the order confirming the plan, this Court reserved jurisdiction to "enter orders necessary to facilitate the implementation of the Plan and to ensure that the purposes and intent of the Plan are carried out." Doc. No. 61.

[45] Doc. No. 173.

The Court concludes, first, that the failure of members to make their capital contributions by March 31, 2014, cannot be a default justifying the forfeiture of their interests. Neither Matton, nor any other member, contributed capital by that date. Yet, Matton and Dr. Shorr signed the consent on April 24, 2014 purporting to hold a majority of member interests. If they still held their interests on that date, then so did all of the other equity holders.[46]

Second, Section 4 of the plan was not a self-executing procedure. Even though the approved disclosure statement and plan established a funding obligation, the mechanism was left unstated. In what form (*i.e.*, personal check or cash equivalents) would the payments have to be made? Would a check have to clear by the effective date? What pro rata percentages would be applied? What were the amounts to be paid? How much notice would be given to interested members of any increase in their capital requirement if others declined to participate? None of those basic details was ever stated or disclosed.

Behind the scenes, however, Debtor's counsel and Matton were acting in concert to change the timing of payments, from either 12 or 60 months, to a single lump sum. They were also negotiating a reduction in the amount to be paid on the County's tax claim. There is no indication that the other equity holders were ever told of the opportunity to fund a lesser burden than the $65,000 funding obligation set forth in the plan.

The Court concludes that Matton's goal was to take advantage of the passage of the effective date to take over the Debtor. First, no creditor had requested dismissal of the case or presented the issue to the Court.

---

[46] Matton and Dr. Shorr would have had no more than a combined 50% interest in the Debtor. Thus, they would not have held a majority of interests. Florida Statute § 605.0407(4) requires a corporation to provide notice within 10 days to all of its members when an action is "taken by fewer than all of the members without a meeting . . . who did not consent in writing to the action or who were not entitled to vote on the action." Kearney was not notified until May 19, 2014, well after the 10 day requirement. There is no indication that any of the other equity holders were aware of or consented in writing to this action. Kearney Exhibit 25.

Second, Matton, with the assistance of Debtor's counsel, concealed his efforts in a number of ways, by:

    (1) omitting any disclosure, in his affidavit executed in support of confirmation, of the identity and affiliations of post-confirmation management;[47]

    (2) withholding notice to other equity holders of the details of how, when, or in what amounts to make their capital contributions, details that Debtor's counsel and Matton were actively discussing;

    (3) Attorney Brundage communicating only to Matton about the revised payments and funding of the plan;

    (4) funding and distributing the creditor payments outside the debtor-in-possession bank account;

    (5) withholding information for more than a month regarding the payoff of creditors;

    (6) Matton meeting privately with Dr. Shorr, as a majority of equity holders, to remove Kearney and then waiting nearly another month, after creditors had been paid, to notify Kearney of this;

    (7) Matton instructing Attorney Brundage not to respond to Kearney (or to Satterwhite) after the foregoing steps had been taken;

    (8) Matton, with Attorney Brundage's advice, seeking, without notice to Kearney or any other member, a final decree premised on a request for a judicial finding that Matton had properly become the sole owner of the Debtor, a tactic that Attorney Brundage opined was "worth a try;" and

    (9) serving only the Office of the U.S. Trustee with copies of the Certificate of Substantial Consummation and the Motion for Final Decree.

It is not hard to see how ownership of the Debtor might be of strategic importance to Matton. Kearney alleges that Apex has usurped the Debtor's business and intellectual property. The overlap of their businesses is apparent. Until recently, the Apex website referred to the

---

[47] *See* 11 U.S.C. § 1129(a)(5). In his affidavit in support of confirmation, Matton stated that each requirement of 11 U.S.C. § 1129(a) had been met.

technology being utilized by the Debtor; two of the Debtor's key people (Dr. Shorr and Mr. Calco) moved over to Apex after the Debtor's plan was confirmed.[48]

It is not for this Court to adjudicate Kearney's charges regarding Apex, or any claims that the Debtor may ever assert against Apex. But, it is a reasonable inference that Apex would not likely face any challenge if Matton is the sole owner of the Debtor.

In this case, the plan provided for extinguishing a members' interests if they failed to participate in funding the plan. Because the plan provided for extinguishing property rights, the equity holders are entitled to due process, which requires "a serious effort to inform them personally."[49]

Here, the Debtor failed to sufficiently advise equity holders of the procedure to contribute capital. By making all of the plan payments himself, on terms that were never disclosed beforehand, Matton sought to divest the other equity holders of their interests without adequate notice.

## CONCLUSION

The equity holders did not receive adequate notice of the process to make the capital contributions required by the plan. For that reason, the Court concludes that there has been no forfeiture of equity interests. But, the Court will not adopt the process, requested by Kearney, of soliciting proofs of interest, having an objection period, and then adjudicating proofs of interest and determining how much everyone owns and owes. Likewise, the Court will not limit participation to Kearney. All members were prejudiced by the lack of due process described above.

---

[48] Kearney Exhibits 38-39, 42-43; First Trial Tr. 144:20-145:15; 148:1-22; 150:2-16; 151:2-13; Second Trial Tr. 66:14-72:14.

[49] *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 318 (1950).

The Debtor's disclosure statement was approved without objection. Therefore, the members' interests, as set forth in the disclosure statement, are binding, but only for the purpose of the making of capital contributions to fund the plan. Because of the apparent alignment of Debtor's counsel with Matton's interests, the Debtor will have to engage a disinterested lawyer, acceptable to both Kearney and Matton, as special counsel, tasked with preparing and soliciting, pro rata, the capital contributions from each of the equity holders as stated in the disclosure statement.[50]

Accordingly, it is hereby

**ORDERED**

1. The forfeiture of stock of any member who failed to make a contribution of capital by March 31, 2014, is hereby declared void;

2. The Objection to Debtor's Motion for Final Decree filed by Kearney (Doc. No. 68) is sustained, in part. The Court reserves ruling on the Debtor's Motion for Final Decree until completion of the requirements set forth below in paragraph 3;

3. The Debtor is directed to engage a disinterested lawyer, acceptable to both Kearney and Matton, as special counsel, who shall prepare an appropriate letter or form to solicit up to $65,000 (to cover the plan payments and the fees of special counsel) from each of the members in the percentages stated on pages 5-6 of the approved disclosure statement. The procedure to be employed shall allow for re-computation of the pro rata contributions in the event any member declines to participate, and shall include, without limitation, notice of stated deadlines for (a) the initial election to participate, (b) for re-solicitation, if necessary, and (c) the

---

[50] Matton and the debtor have two joint motions pending, a Joint Motion for Sanctions against Bryan Kearney for Spoliation of Evidence and Fraud on the Court (Doc. No. 140), and a Joint Motion for Sanctions against Bryan Kearney for Fraud on the Court and for Leave to Conduct Rule 2004 Examination of Rowlson & Company, P.A. (Doc. No. 144). Both deal with allegations of intentional misconduct by Kearney in this proceeding. The relief provided by this order would appear to make moot the issues raised by these motions.

deadline and method for delivering the capital contributions.

4.  Mr. Matton will be entitled to a refund from the Debtor to the extent that his previous contribution of $56,250 exceeds his recomputed pro rata share.

5.  The Court will hold a status conference on September 10, 2015, at 3:00 p.m., Courtroom 9B, to receive a report from special counsel on the capital contribution process and consider entering a final decree.

Clerk's Office to Serve